NATHAN WORTH, complainant, respondent,

*v.*

ERNEST WATTS, executor, &c., of Firman Dubel, deceased, defendant, appellant.

[Submitted June 17th, 1909.   Decided November 15th, 1909.]

A court of equity, when asked to decree the specific performance of a contract, will examine not only the contract itself, but the relations of the parties and the surrounding circumstances; and if by reason of inadequacy of consideration and the other circumstances of the case, there is reason to suspect fraud, specific performance will be denied, and the complainant left to his remedy at law.

On appeal from a decree advised by Vice-Chancellor Leaming, whose opinion is reported in *70 Atl. Rep. 357.*

*Mr. Eckard P. Budd* and *Mr. Joseph H. Gaskill,* for the appellant.

*Mr. John W. Wescott* and *Mr. Alexander J. Brian* (of Pennsylvania), for the respondent.

The opinion of the court was delivered by

PARKER, J.

The bill was filed by the vendee named in an alleged contract to sell real estate against the executor of the vendor named therein, for a decree that the executor make a deed of the real estate in performance of the contract.

· A preliminary question was mooted at the argument in this court, whether in view of the death of the vendor, the language of his will, and the fact that the beneficiaries thereunder were not parties defendants, an effective decree of specific performance could be made.  The point having been made for the first time

in this court, and then upon the oral argument, we deem it inadvisable to pass upon it, as the case may be disposed of on its merits.

The basis of the suit is a paper-writing dated February 2d, 1904, purporting to be an agreement by Firman Dubel, and of which the following is a copy:

"Office of Nathan Worth, Dealer in General Merchandise, 303–305 High street. Telephone Call No. 49. Burlington, N. J., Feb. 2,· 1904." (Then in writing) "Received from Nathan Worth twenty-five hundred dollars ($2500.00) on account of purchase price for houses and lots 303 and 305 High street, and 20 and 22 Union street, Burlington, N. J., which I agree to sell to him clear of all encumbrances for four thousand dollars ($4,000.00), deed to be delivered on payment of the balance of money, he to continue payment rent as before until balance paid. Firman Dubel."

There were also six other papers in the form of receipts for various amounts, dated between June 17th and November 1st, 1904, and amounting in all to $1,300. They are precisely alike except as to date and amount, and the absence from one or two of the printed heading; and only the first is copied here:

"Office of Nathan Worth, Dealer in General Merchandise, 303 and 305 High street. Telephone Call No. 49, Burlington, N. J. June 17, 1904.

"Received of Nathan Worth Two Hundred and Fifty Dollars ($250.00) as payment for properties 303 and 305 High street and 20 and 22 Union street, Burlington, N. J., agreed to be sold by me to him as per receipt of February 2, 1904. Firman Dubel."

The signatures to all these papers are admittedly in the handwriting of Firman Dubel; the body of them all, admittedly in the handwriting of Worth, the complainant. It was established by a number of reputable witnesses and found as a fact by the vice-chancellor, that the property comprised in the agreement was worth in the market between eight and ten thousand dollars, and in all probability in excess of nine thousand dollars. The contract price was therefore so inadequate that standing alone it would raise grave suspicion of fraud in the procurement of the contract. This feature of the case appealed strongly to the vice-chancellor, but seems to have been overcome by what he evidently found to be a fact, viz., that after the date of the contract the six other re-

ceipts for payments on account were signed, all *referring* to the agreement of February 2d, 1904, and therefore in the vice-chancellor's opinion reaffirming the original paper as a contract; and the force of these receipts was not overcome in his mind by the other testimony in the case tending to discredit them. In view of these receipts and of other considerations appearing in his opinion, he concluded that the defendant had failed to show that the paper of February 2d, 1904, was not the intelligent and deliberate act of the testator, and accordingly decreed specific performance of it. That decree is now before us for review.

The evidence is voluminous, but the facts are not complicated. Firman Dubel died December 28th, 1904. For some time previous to his death he was an habitual drinker, and during the last year or so of his life was a heavy drinker, increasingly under the influence of liquor as the day wore on, and frequently intoxicated in the afternoon. He was a bachelor and regarded as a miser. He owned a number of properties in Burlington, among which was the property 303 and 305 High street, rented by complainant, Worth, and occupied by him for stores and dwelling at a rent of $40 per month.

In the spring of 1904, according to Watts' testimony, while Dubel was ill and could not collect his own rents, and Watts was therefore managing the property, Worth came to him and pleaded for a reduction of rent, on the ground that he could not afford to continue at the rent he was paying, and offered to compensate Watts if he would use his influence with Dubel to get a reduction to $35. It does not appear that any reduction was made, but in August considerable repairs to the plumbing were made, and paid for by Dubel, and in December, just before his death, some further repairs were made. The first notice to Watts that Worth had any claim as purchaser of the property was on the day after Dubel's death, when Worth called at Watts' office and informed him of his claim under contract of purchase. He subsequently submitted the papers to Watts and intimated that he would pay him for helping the matter through, which Watts declined to do.

The story of the signing of the agreement and subsequent receipts as related for the complainant mainly by his wife and daughter, is that there was a sort of social intimacy between

Worth and his family, and Dubel; that Dubel was sometimes their guest at meals, had to some extent the run of the house, made little presents to the children, and so on; that on the occasion when the agreement of sale was signed by Dubel, according to Mrs. Worth's testimony, the parties were in Worth's apartments and there agreed orally on all the terms, and Dubel said he did not wish anyone to know until the deed was made; that Worth said Mr. Watts would have to draw the "bill of sale" and Dubel said no and told Mr. Worth to draw it himself. Worth objected, saying he had never done anything like it, but being urged by his wife, "went into the store and took paper and pen and ink and a dictionary and drew this bill of sale * * *" (meaning the agreement and receipt for $2,500). Mrs. Worth says she saw the money paid in bills and the agreement signed, and was also a witness to the signing of the six additional receipts and saw the money paid also when they were signed.

Bearing this evidence in mind as we examine the form and contents of the papers on which the complainant's claim is based, the first thing noticeable is the legal sufficiency and precision of the so-called contract, combined with brevity and terseness. It contains, exclusive of date and signatures, less than seventy words, but is absolutely complete in itself, with names of parties, description of property, price, and terms as to encumbrances, delivery of deed, and status of the parties as landlord and tenant until the transaction be closed. It is a document to evoke appreciation from a lawyer. Yet the testimony of complainant's wife is to the effect that this admirably drawn paper was prepared on the spur of the moment by her husband, a small tradesman of but limited education, with the aid of a dictionary, and that he was willing to risk $2,500 in cash on its legal sufficiency or on his personal confidence in Dubel, or both. The receipts also are very full and specific and apparently the production of at least a well educated business man. The clause in the agreement providing for delivery of deed may also be significant. Deed is to be delivered on payment of balance of the purchase-money, thus enabling Worth to choose his own time for completing the transaction, and to wait, if this was his intention, and if there was any fraud in the agreement, until Dubel's lips were sealed by death

and the obligation could be asserted with less danger of successful challenge. These features of the agreement tend, in our judgment, seriously to impeach Mrs. Worth's testimony as to its preparation and execution.

The gross inadequacy of the consideration has already been mentioned. Its importance as a badge of fraud is emphasized by the fact that the property was subject to a mortgage of $2,000, so that by agreeing to convey a $9,000 property for $4,000, Dubel was in fact agreeing to sell a $7,000 equity for $2,000, plainly a more grossly inadequate consideration than ever, and one more likely to satisfy a court that Dubel must have been deceived into signing such a paper.

Again, Worth's delay in completing his purchase is worthy of note. Irrespective of the fact that in view of the $2,000 mortgage, he had paid for the property and $500 over on delivery of the agreement, unless Dubel paid off the mortgage (which he did not do), it is evident that so long as Worth delayed taking his deed he was losing the use of the money paid by him while at the same time paying rent. It would have been a simple matter to raise the $1,500 remaining to be paid by negotiating a mortgage, and this course would at once have stopped the payment of rent. That a man of Worth's characteristics, claiming to be too poor to pay $40 rent, and yet wealthy enough to pay $2,500 in cash on short notice, or no notice, should have permitted the rent to run on month after month under such circumstances, unless he had some ulterior motive, is almost inconceivable.

There are other facts in the case, not so important, but worthy of consideration: The petty amount of Worth's bank deposits as shown by his bank account; the fact that not one of the alleged payments on the contract was made by check, though Dubel received many checks from other debtors; the evidence that Dubel was accustomed to sign receipts without reading them, especially when intoxicated; the repairs and improvements made by Dubel on the building after the date of the contract—all these support the suspicion aroused by the inadequacy of price and the circumstances surrounding the alleged original transaction. Taking all together, the low price, the form of the agreement, the fact that Worth wrote it and the receipts, the secrecy observed during

Dubel's lifetime and its immediate assertion after his death, Worth's apparent poverty as contrasted with the considerable payments recited in the papers, his apparently intentional omission to secure a deed in Dubel's lifetime, and his attempt to secure the executor's aid in consummating the sale, we think a strong case of fraud was made out. The court below laid great stress on the existence of six receipts apparently affirming the contract of February 2d. These papers were undoubtedly signed by Dubel; if his signature was not procured by fraud, they are cogent evidence that some agreement of sale was in fact made on February 2d. Some suspicion is cast on them also by the evidence, but even if genuine and *bona fide,* they affirm nothing more than that Dubel had agreed to sell the property to Worth. As to the price they are silent. Dubel may well have agreed to sell for $10,000 and received $2,500 or some other sum, on account, and been induced to sign an agreement stating the purchase price as $4,000, believing it to state the true figure. So that if the receipts are genuine they are still not proof that the purchase price was truly stated in the contract.

The question then is, whether in view of the evidence in this case, a court of equity should decree specific performance. The law is well settled. In *Crane* v. *DeCamp, 21 N. J. Eq. (6 C. E. Gr.)* (at *p. 418*), Justice Scudder, speaking for this court, said: "This is an application addressed to the sound legal discretion of the court. There is no rule in equity more clearly established, than that upon application for a specific performance of a contract, the court must be satisfied that the claim is fair, reasonable and just, and the contract equal in all its parts. If these points are not established by the complainant he will be left to his remedy at law (citing authorities). In judging of the fairness of a contract, the court will look not merely at the terms of the agreement itself, but at the relations of the parties and all the surrounding circumstances" (citing *Fry Spec. Perf.* § *239*). In 1831 Chancellor Vroom said, in *Rodman* v. *Zilley, 1 N. J. Eq. (Saxt.) 320, 324:* "Courts of equity seldom interfere to set aside sales and contracts on the ground of inadequacy of price. They leave the parties to their legal remedies. But when they are called on for extraordinary aid to enforce a contract, they take

the liberty to examine into the consideration to be given, its fairness and equality, and all the circumstances connected with it. And if anything manifestly inequitable appears in that part of the transaction, they will never lend their power to carry the contract into execution."

It is true that courts of equity will not interfere with bargains on the ground of inequality alone, unless it be so extreme as to shock the conscience, and so amount to evidence of fraud. The cases of *Wintermute* v. *Snyder, 3 N. J. Eq. (2 Gr. Ch.) 489; Shaddle* v. *Disborough, 30 N. J. Eq. (3 Stew.) 370,* and *Phillips* v. *Pullen, 45 N. J. Eq. (18 Stew.) 5,* cited by the vice-chancellor, so hold.

But in both *Wintermute* v. *Snyder* and *Phillips* v. *Pullen,* there was a direct attack on the instrument itself, and the court was asked to set it aside, which is a very different thing from refusing its specific enforcement. In *Shaddle* v. *Disborough* the court decreed specific performance, but on a finding that there was no fraud and no inadequacy of price. It was remarked by the chancellor in that case, that "unless the inadequacy is such as to shock the conscience of this court and in itself to amount to conclusive and decisive evidence of fraud in the transaction, a defence to such an action as this, based on that alone, will not avail." We need not pass on the accuracy of this proposition because the present case does not fall within it. Taking, in connection with the inadequacy of consideration, the other circumstances of the case as detailed above, we are of opinion that such an atmosphere of suspicion surrounds and permeates the whole case that a court of equity, governed by the principles laid down in *Rodman* v. *Zilley* and *Crane* v. *DeCamp,* should refuse the relief by way of specific performance as prayed for in the present bill.

It may be that some contract of sale was made, and that moneys were paid thereon by Worth. If he can establish such facts in a court of law, he may have his remedy there by way of damages or a return of the moneys paid; but specific performance of the alleged contract set up in the bill should be denied. The decree of the court of chancery will accordingly be reversed, and its record remitted with directions to dismiss the bill of complaint.

*For affirmance*—None.

